## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Eide Bailly LLP,

       Plaintiff and Counter-Defendant,

                                        **MEMORANDUM OF LAW**
                                            **AND ORDER**

v.                                Civil File No. 22-03132 (MJD/LIB)

Michael Humphreys, Acting Insurance
Commissioner of the Commonwealth
of Pennsylvania, in his capacity as the
Statutory Rehabilitator of Senior Health
Insurance Company of Pennsylvania,

       Defendant and Counter-Claimant,

Lawrence M. Shapiro, Mark L. Johnson, Aaron P. Knoll, & Emily M. McAdam,
Greene Espel PLLP, Counsel for Plaintiff and Counter-Defendant.

Heather L. Marx, Michael Broadbent, Dexter R. Hamilton, & Matthew J. Siegel,
Cozen O'Connor, Counsel for Defendant and Counter-Claimant.

## I.   INTRODUCTION

     This matter is before the Court on Plaintiff/Counter-Defendant Eide Bailly

("EB")'s Motion to Dismiss the Amended Counterclaim.  (Doc. 40.)  For the

reasons discussed below, the motion is granted in part and denied in part.  For

simplicity, the "Amended Counterclaim" is referred to as "the Counterclaim" in this Order.

## II.    RELEVANT FACTS

The facts are taken from the Amended Answer and Counterclaim and are assumed to be true.  The Counterclaim states claims for breach of fiduciary duty, negligence/accounting malpractice, and breach of contract arising out of the Parties' professional relationship.  (Countercl. ¶¶ 180-200.)

### A.    The Parties

#### 1.    Senior Health Insurance Company of Pennsylvania ("SHIP")

SHIP is a long-term care ("LTC") insurer that has been in rehabilitation under the supervision of the Commonwealth Court of Pennsylvania since January 2020.  (Id. ¶¶ 23-24, 166.)  "SHIP" will variously be used to refer to the insurance company and to the Defendant/Counter-Claimant in this action, the Rehabilitator.  Rehabilitation "is a court supervised process intended to remedy the company's financial deterioration for the benefit of policyholders and creditors.  The Rehabilitator is charged with the protection of the company's policyholders, creditors and the public.  The rehabilitator's actions are dictated

by the laws and regulations of Pennsylvania and are subject to review by the

Commonwealth Court." https://www.insurance.pa.gov/Regulations/

LiquidationRehab/Documents/GA/GA_FREQUENTLY_ASKED_QUESTIONS_U

PDATED_FEBRUARY_12_2020.pdf (last visited March 26, 2024).

SHIP's recent ownership and operational history is complicated.  Until

2008, SHIP was a subsidiary of CNO Financial Group ("CNO"), which

transferred ownership of SHIP to a newly-formed trust, which was then merged

into an independent oversight trust, the also newly-formed Senior Health Care

Oversight Trust ("SHOT"), due to significant underwriting losses for SHIP

policies.  (Countercl. ¶¶ 26-27.)  CNO and its subsidiaries made approximately

$915 million in capital contributions to SHIP.  (Id. ¶ 28.)

SHIP maintained its own operations until 2012, when Fuzion Analytics,

Inc. ("Fuzion") was formed as a wholly-owned subsidiary of SHOT, ostensibly to

provide administrative and management services to SHIP and other long-term

care insurance companies.  (Id. ¶ 29.)  Pursuant to a 2012 Agreement, SHIP

conveyed essentially all of its employees and infrastructure to Fuzion in

exchange for agreed-upon cash consideration and Fuzion assumed responsibility

for the administration of SHIP's long-term care policies.  (Id. ¶¶ 30-31.)  Since

2012, SHIP has had no facilities or employees and relies exclusively on Fuzion

and other vendors for its operations.  (Id. ¶ 31.)  In August 2019, SHOT

transferred all of its interest in Fuzion to SHIP as a capital contribution.

Accordingly, Fuzion is now a wholly-owned subsidiary of SHIP.  (Id. ¶ 32.)

SHIP began experiencing a material increase in financial difficulties "[a]t

least by 2015, and perhaps earlier," that led to the rehabilitation proceedings

described in the Counterclaim.  (Id. ¶ 45.)  Thus, during the relevant time period,

SHIP was an LTC company in run-off, i.e., only a fraction of its business remains

in force, and it will not generate any new business.  (Id. ¶¶ 25, 38.)  SHIP blames

its deterioration, "at least in part [on] diminished assets caused by poor

management, imprudent investment decisions, and insufficient premiums and

premium rate increases, coupled with increased liabilities caused, in part, by

demographic and market changes that led to higher than planned benefits costs."

(Id. ¶ 45.)

SHIP asserts that it was advised by a series of third-party consultants,

including EB, that "provided overly optimistic, inappropriate, or inaccurate

estimates, assumptions, and calculations related to SHIP's financial health" and

"failed to notify SHIP or regulatory authorities of red flags that they knew or

should have known existed regarding SHIP's financial condition."  (Id. ¶ 46.)

SHIP states that it relied on "the purported expertise, advice, and opinions of EB

to help make critical financial decisions in the management of its business and to

ensure that SHIP reported and provided accurate, complete, and truthful

information to SHIP's domestic regulator, the Pennsylvania Insurance

Department [("PID")], and other regulatory authorities."  (Id. ¶ 47.)

### 2.    Eide Bailly ("EB")

EB was SHIP's independent auditor from 2013 to 2020.  (Id. ¶ 33.)  In that

role, EB provided audit services required under Pennsylvania law, "including to

provide an independent opinion as to whether SHIP's financial statements

presented its financial condition and the results of its operations and cash flows

fairly in all material respects."  (Id. ¶ 35.)  In relevant part, Pennsylvania law

states that "every insurer . . . [shall] have an annual audit performed by an

independent certified public accountant and shall file as instructed by the

Commissioner an audited financial report for that year on or before June 1 for the

year ending December 31 immediately preceding unless an extension is granted .

. . ." 31 Pa. Code § 147.3.  (Id. ¶ 33 (ellipses in original).)

As an independent auditor, EB was required to adhere to Generally

Accepted Accounting Standards ("GAAS") when conducting audits.  (Id. ¶ 36.)

EB's audit opinions each covered two years and its audit opinions from 2013-20 for fiscal years 2013-19 stated that the audits were conducted in accordance with GAAS. (Id. ¶¶ 34, 36, 121.) At the time that EB became SHIP's auditor, the LTC industry was having financial difficulties, "largely stemming from aggressive actuarial assumptions which resulted in inadequate policy pricing and materially understated loss reserves . . . ." (Id. ¶ 38.) Therefore, EB had to "understand the risks of SHIP being a [sic] LTC company in run-off" and the "key vendors and consultants upon which SHIP relied," including SHIP's appointed actuary, Milliman, USA. (Id.)

### B.   Relevant Background Information and Entities

#### 1.   Milliman USA ("Milliman") and Lewis and Ellis ("L&E")

SHIP engaged Milliman USA as its actuary from as early as 2008 until at least 2019. (Id. ¶¶ 38, 48.) During three years of litigation in another case, the Commonwealth Court of Pennsylvania criticized and, in 2012, "rejected" Milliman's actuarial work for two other Pennsylvania LTC insurers "before and after the start of the receivership, finding that Milliman's analyses and calculations 'fluctuated wildly' and 'violently in a short period of time,' and that Milliman's projections were 'inherently unreliable.'" (Id. ¶¶ 41-42.) In its

decision denying the insurers' request for liquidation and requiring rehabilitation in that case, the word "Milliman" appeared 295 times.  (Id. ¶ 42.)

### 2.     Issues with Milliman's Work for SHIP

In this case, Milliman provided 2015 assumptions that misrepresented SHIP'S financial health, "potentially concealing a massive deficit that SHIP should have recognized in its financial statements."  (Id. ¶ 141.)

EB was required to "review Milliman's estimates, assumptions, and methodology because Milliman's work formed the backbone of SHIP's financial and statutory reporting."  (Id. ¶ 49.)  To that end, EB engaged third-party expert consultants to assist it by reviewing Milliman's work.  (Id.)

L&E, an outside actuarial firm that had been engaged by EB to provide actuarial expertise for EB's audit of SHIP's business, brought "potential deficiencies" with Milliman's actuarial work for the years 2012-13 and 2013-14 to EB's attention.  (Id. ¶ 52.)  Ultimately, however, L&E actuaries concluded they could accept Milliman's results for those years and EB provided SHIP with clean audit opinions.  (Id. ¶¶ 50-52.)

### 3.     Growing Concern with Milliman's Work for SHIP

L&E continued to take issue with Milliman's work for SHIP.  (Id. ¶¶ 135-39.)  In June 2016, Brian Rankin, an LTC actuary and principal at L&E provided

EB with L&E's draft actuarial audit of SHIP as of December 31, 2015. (Id. ¶¶ 139-40.) The audit found that Milliman's assumptions regarding lapse, mortality rate, and the lengthening of the morbidity improvement were not quantitatively supported by Company experience; the ultimate lapse rate was set outside of LTC cash flow testing standard practice; and that there was "a circular nature" to the calculation of the active life reserves and cash flow testing. (Id. ¶ 140.) For the first time, the June 2016 report revealed that Milliman's 2015 assumptions "had the effect of misrepresenting SHIP's financial health, potentially concealing a massive deficit that SHIP should have recognized in its financial statements. . . . Milliman had been wrong three years in a row. . . ." (Id. ¶ 141.)

L&E's Rankin "was so concerned about the calculation that Milliman was advancing for SHIP's active life reserves that he took the unusual step of reaching out to PID actuaries directly to raise his concerns," although the PID could not communicate with Rankin without SHIP's permission and therefore the PID did not discuss this issue with him. (Id. ¶ 142 & n.11.)

On March 31, 2016, Joe Pope of EB learned that Rankin contacted the PID about L&E's concerns with Milliman's assumptions. (Id. ¶ 143.) On the same day, Pope directed Rankin to communicate his concerns to Milliman and get

additional information from them "so [L&E] could get on board with revising its

opinion to allow [EB] to issue a 'clean' audit opinion."  (Id.)

     Although EB tried to persuade L&E to abandon its analysis of Milliman's

work, L&E would not do so.  (Id. ¶ 145.)  Therefore, on May 20, 2016, Pope wrote

to Tom Hampton, a SHIP trustee who chaired SHIP's audit committee, and told

Hampton that L&E did not expect it would change its position because it

believed the change in assumptions "from 2014 to 2015 that are at issue have not

been supported."  (Id.)  Pope also told Hampton that it was time to "move

forward with obtaining a 3rd actuary."  (Id. ¶ 147.)

     On June 6, 2016, Pope announced that EB had contracted with David

Axene of Axene Health Partners ("Axene") as its additional support actuary.  (Id.

¶¶ 152-53.)  On the same day, Paul Lorentz, SHIP's CFO, asked the PID for an

additional extension of time for the submission of SHIP's financial statements,

stating that L&E "assigned a new actuary to review SHIP's actuarial assumptions

and additional days are requested to complete this project."  (Id. ¶ 152.)

     Likewise, on June 8, 2016, Pope wrote to the PID to satisfy the statutory

requirement that an extension request be supported by the insurer and its

independent auditor, that stated there were "unforeseen delays" from L&E's

review of certain Milliman assumptions when the real reason for the delay was

that EB switched actuarial consultants because L&E disagreed with Milliman.

(Id. ¶¶ 154-57.)

### 4.      The Beechwood Investments

In February 2014, Fuzion and an entity known as Beechwood Re

("Beechwood") entered into an agreement under which Fuzion would provide

third-party administration and management services to Beechwood, a group of

reinsurance and asset management companies formed by the principals of the

now-defunct hedge fund Platinum Partners ("Platinum").  (Id. ¶¶ 61-62.)  From

May 2014 to March 2015, SHIP invested $320 million of its reserves with

Beechwood.  (Id. ¶ 63.)  The investments were funded by SHIP with assets it was

required to hold for benefits that would be owed to policyholders.  (Id.)  In

exchange for SHIP's $320 million investment, a Beechwood affiliate guaranteed

an alleged annual return of 5.85% over a period of five years, "which at the time

substantially exceeded market returns for investments suitable for SHIP."  (Id.)

Beechwood described the investments it was making "with SHIP's $320 million

as high-quality and high-yield investments, and stated that it was investing

SHIP's money conservatively and that the investments were more than

sufficiently collateralized."  (Id. ¶ 65.)

10

SHIP's Board believed Beechwood was investing the monies in secured loans that were rated NAIC 1 and 2, which are "investment grade securities." (Id. ¶ 66 & n.6 (stating that "NAIC" is an acronym for "The National Association of Insurance Commissioners," which rates securities from 1 to 6; only those in the first 2 tiers are deemed "investment grade").)  The ratings of the Beechwood investments, however, were "suspect" because they were based on incorrect information provided by Beechwood, itself, to ratings agencies.  (Id. ¶ 66.) Moreover, Beechwood's valuations were not independent, "but rather were concocted by an entity that worked closely with Beechwood [] to ensure they were consistent with Beechwood's [] expectations and needs."  (Id. (cleaned up).)

In October 2014, CPA Michael Rhoads, a Fuzion financial auditor, reviewed the custodial agreements governing SHIP's Beechwood investments and determined they were not compliant with 2014 NAIC guidance, which is applicable under Pennsylvania law.  (Id. ¶ 67.)

### a.     Investment Management Agreements with BAM

SHIP's investments in Beechwood were formalized by investment management agreements ("IMAs") with a nonregistered investment advisor subsidiary of Beechwood called BAM Administrative Services ("BAM").  (Id. ¶

68.)  Through three IMAs implemented between 2014 and 2015, "SHIP forfeited its rights to the collateral purportedly securing the return promised by Beechwood."  (Id. ¶¶ 68-69.)  The IMAs were structured such that SHIP had no oversight or ability to exercise its rights with regard to any of the Beechwood investments.  (Id. ¶ 70.)  Those rights were effectively turned over to BAM.  (Id.)  The IMAs also allowed Beechwood to use leverage in the account at its discretion, "thus putting Beechwood's interests ahead of those of SHIP."  (Id.)

Moreover, under the IMAs, the false valuations also triggered $33.5 million in performance-based bonus payments from SHIP to Beechwood but did not require Beechwood to report the performance fee, in violation of the Pennsylvania Insurance Code.  (Id. ¶ 71.)  In short, the IMAs gave Beechwood ultimate control of the investment valuations, which incentivized Beechwood "to manipulate pricing to increase its (wrongfully unreported) performance fee. . . . [when its] investments were highly speculative and opaque, and riddled with related-party transactions creating risks for SHIP."  (Id. ¶¶ 72-73).)

### b.    The End of the Beechwood Investments

"On June 8, 2016, . . . a Platinum co-founder was arrested on bribery charges and its offices were raided under suspicion of running a Ponzi scheme,

12

including through the use of SHIP's $320 million investment." (Id. ¶ 74.)  After

the arrest, SHOT hired an outside consultant to evaluate the IMAs and

investments made under them on SHIP's behalf.  The consultant concluded that

(1) SHIP's belief that the Beechwood investments were all high-quality assets

with secure collateral positions was "questionable"; (2) the alleged positive

NAIC ratings of the Beechwood investments were "dubious given the conflicts of

interest, the control position of Beechwood, and the time limitation on the length

the rating remained intact" (analysis confirmed that Beechwood "held a negative

capital position and did not conform to accounting standards"); (3) there was to

be little or no oversight of the Beechwood investments management programs by

SHIP's management; and (4) legal documentation supporting SHIP's investments

in Beechwood was incomplete or missing.  (Id. ¶¶ 75-78.)

    "At a November 2016 SHOT executive session meeting, it became clear

that SHIP's valuation of Beechwood [] investments was likely inaccurate";

further review found red flags regarding conflicts of interest, incomplete

documentation, and flawed ratings reports.  (Id. ¶¶ 79-80.)  By the end of 2016,

SHIP began ending its relationship with Beechwood and listed SHIP's

investments as a "significant risk while planning . . . audits." (Id. ¶¶ 81, 83.)

5.      **The Roebling Transaction**

"In 2016, SHIP sought to increase surplus by entering into a reinsurance transaction with Roebling Re [("Roebling")], a newly established entity domiciled in Barbados."  (<u>Id.</u> ¶ 85.)  Roebling only ever entered into a reinsurance transaction with SHIP.  (<u>Id.</u>)  In addition, Roebling never received any assets outside of SHIP's assets and appeared to be entirely funded by SHIP. (<u>Id.</u>)  Though funded as a legitimate reinsurance transaction, Roebling had no funds of its own to pay the excess liabilities it contracted to pay.  (<u>Id.</u> ¶¶ 86-89.) In fact, Roebling did not have any resources other than funds provided to it by SHIP, so there was no required meaningful transfer of risk from SHIP to Roebling.  (<u>Id.</u> ¶¶ 89, 99.)  "As a result of the transaction, the loss reserves on SHIP's balance sheet decreased by 49%, SHIP recorded a liability in the amount equal to the assets transferred to the funds withheld account ($1.3 billion), and SHIP received a reinsurance commission from Roebling [] to cover SHIP's expenses, which was paid in the form of a 'Class B' note issued by Bruckner Investment Trust ('the BIT')."  (<u>Id.</u> ¶ 86.)

In addition, Roebling "was permitted to withdraw the first $100 million of what was planned to be at least $300 million from the funds withheld account to fund certain investments, and to substitute for the amount withdrawn certain

14

securities of dubious or misstated value. The flawed transaction also included unachievable projections on returns on investments." (Id. ¶ 90.)

"To fund the investments, SHIP transferred $100 million from its funds withheld account to the BIT. The BIT then invested $88.2 million of the monies into securities." ( Id. ¶¶ 92-93.) However, SHIP's management and those acting with them falsely represented that these securities had a value of $150.9 million. The purchased securities were also not rated by a recognized rating organization and were purchased originally by a non-insurer, the BIT. (Id. ¶ 92.)

In return for its investment, the BIT issued SHIP a note with a 2.5% coupon rate and a 15-year maturity date, which was collateralized by the purchased securities (the returns of which were used to pay the note), Roebling's stock (profits from the securities, if any) and the BIT's other property (which was non-existent beyond cash flows from the Roebling arrangement). (Id. ¶ 94.) Without justification, SHIP and EB valued the BIT note at $100 million. (Id. ¶ 95.) The BIT also issued a $29 million note to Roebling for Roebling's alleged contributions to capitalization of the BIT and its alleged efforts to enter into the Roebling transaction. The note was "inferiorly collateralized to the $100 million note" and has a 20-year maturity date. (Id. ¶ 96.)

Within just over a year, Roebling could no longer maintain its reserving obligations under the co-insurance agreement.  The BIT was also unable to repay its note to SHIP.  (Id. ¶ 101.)  During the next year, the BIT used almost all of its retained cash and Roebling transferred another $19 million of the note to SHIP, to avoid triggering a funding top up obligation.  (Id. ¶¶ 101-03.)  By December 2017, the BIT presumably had only approximately $500,000 in its accounts, which meant that within 15 months of the initial investment, SHIP was relying completely on the performance of the collateralized securities "and had no material reinsurance protection" from the Roebling transaction.  (Id. ¶¶ 104-05.)

In its 2017 annual statement, SHIP stated that "[a]s a result of the reinsurer not meeting its obligations under the reinsurance contract, the Company recognized a $12.6 million reduction in surplus due to a reserve credit deficiency in 2017."  (Id. ¶ 106.)  As of April 2018, SHIP was still owed $98 million under the initial note and $31.2 million under the Roebling note and, in its April 2018, regulatory filings, SHIP stated that it was terminating its reinsurance agreement with Roebling.  (Id. ¶¶ 108-09.)  SHIP exited this transaction at the urging of the PID.  (Id. ¶ 109.)  SHIP has only a worsened financial condition to show for the millions of dollars it expended in the Roebling transaction.  (Id. ¶ 110.)

16

6.      **SHIP Enters Rehabilitation**

In 2018, SHIP "booked a premium reserve deficiency of $373.6 million, materially increasing SHIP's loss reserves and causing surplus to be negative." (Id. ¶ 161.)  On March 1, 2019, SHIP filed its annual financial statement for the year ending December 31, 2018, with the PID that showed a decline from a reported surplus of more than $12 million as of year-end 2017 to a reported deficit of more than $466 million—a drop of $478 million, which rendered SHIP statutorily insolvent under Pennsylvania law.  (Id. ¶¶ 163-64.)  "On January 29, 2020, the Commonwealth Court of Pennsylvania placed SHIP into rehabilitation. . . ."  (Id. ¶ 166.)  SHIP remains in rehabilitation.  (Id. at 39 n.12.)

Additional facts will be discussed as necessary.

## III.   DISCUSSION

EB raises three arguments in its motion: (1) that Minnesota law applies to this motion; (2) that SHIP's claims are barred by the applicable statute of limitations and therefore SHIP has failed to state a claim upon which relief can be granted; and (3) that SHIP fails to state a claim for breach of fiduciary duty.  The Court will first address EB's arguments and will then address arguments raised by SHIP in its Response.

A.      Choice of Law

The Parties agree that Minnesota law governs all matters related to their

engagements.  (Doc. 43-1 at 6 (Ex. A to Hartmann Decl. (Audit Engagement

Letter)).)  However, SHIP argues that both Minnesota and Pennsylvania law

must be considered to decide this motion.  (Doc. 48 at 14.)

Although SHIP agrees that Minnesota substantive law governs disputes

arising under the contractual agreements between the Parties, SHIP contends

that "it is clear" they intended that both states' laws be used to interpret the

agreements, in particular the obligations EB had to carry out its statutorily-

mandated auditing services.  (Id.)  SHIP notes that the first paragraph of the

Parties' contract uses the word "statutory" five times, which means EB agreed to

satisfy the statutes of the Commonwealth of Pennsylvania.  Specifically, EB

agreed to:

> audit the statutory financial statements of Senior Health Insurance
> Company of Pennsylvania, . . . which comprise the statutory balance
> sheet . . . and the related statutory statements of operations, changes
> in capital and surplus, and cash flows . . . and the related notes to the
> statutory financial statements.

(Ex. A to Hartmann Decl. at 1 (emphasis added to match emphasis in SHIP's

brief).)  In addition, the audit was to be "conducted with the objective of [EB]

expressing an opinion on the <u>statutory</u> financial statements." (<u>Id.</u> (emphasis added to match emphasis in SHIP's brief).)

The Court finds that it need only consider Minnesota law to decide the issues currently before it. First, the Parties' Engagement Letter provides: "This agreement shall be governed by and construed in accordance with the laws of the State of Minnesota (regardless of the laws that might be applicable under the principles of conflict of law) as to all matters including without limitations, matters of validity, construction, effect, and performance." (<u>Id.</u> at 6.) Second, for the most part, SHIP applies Minnesota law when addressing the grounds for the motion to dismiss and does not identify a material conflict between Minnesota and Pennsylvania law as applied to SHIP's claims. (Doc. 48 at 13-27.)

Thus, it appears that SHIP confuses the legal elements of its claims with the state insurance regulations that determine how a company's financial statements must be presented. Even if SHIP, as a Pennsylvania-domiciled insurer, had to present its financial statements in the manner required by the PID, its claims against EB are governed by Minnesota law. Accordingly, SHIP's arguments on this issue are without merit. Minnesota law applies to this motion.

**B.      Whether the Counterclaim Should be Dismissed Under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim Upon Which Relief can be Granted**

**1.      Legal Standard for a Motion to Dismiss**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. 544, 555-56 (2007); <u>Zutz v. Nelson</u>, 601 F.3d 842, 848 (8th Cir. 2010).  However,

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

<u>Zutz</u>, 601 F.3d at 848 (citations omitted); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).  Thus, the

20

Court "need not accept as true a plaintiff's conclusory allegations or legal

conclusions drawn from the facts." <u>Glick v. W. Power Sports, Inc.</u>, 944 F.3d 714,

717 (8th Cir. 2019) (citation omitted).

### 2.   Whether SHIP's Claims are Time Barred

### a.   Legal Framework

SHIP and EB entered into a written tolling agreement on January 28, 2022.

(Ex. B to Hartmann Decl.)  Therefore, any claims that accrued prior to January 28,

2016 are time barred because the statute of limitations (alternatively "SOL") is six

years.  <u>See</u> Minn. Stat. § 541.051(1)(1),(1)(5); <u>Ames & Fischer Co., II, LLP v.</u>

<u>McDonald</u>, 798 N.W.2d 557, 562 (Minn. Ct. App. 2011) (SOL for accounting

malpractice is six years); <u>Hope v. Klabal</u>, 457 F.3d 784, 790 (8th Cir. 2006) (SOL

for breach of fiduciary duty is six years) (citing <u>Anderson v. Anderson</u>, 197

N.W.2d 720, 726 (Minn. 1972)); <u>Untiedt's Vegetable Farm, Inc. v. Southern</u>

<u>Impact, LLC</u>, 493 F. Supp. 3d 764, 767 (D. Minn. 2020) (Minnesota SOL for breach

of contract is six years).

> Minnesota follows the damage-accrual rule.  Under this rule, a cause
> of action accrues and the statute of limitations begins to run when
> "some damage" has occurred as a result of the alleged malpractice.
> This does not depend on the ability to ascertain the exact amount of
> damages—absent evidence of fraudulent concealment—and the
> limitations period is not tolled by ignorance of the cause of action.
> "Some damage" is defined broadly, and the cause of action accrues

on the occurrence of any compensable damage, whether specifically
identified in the complaint or not.  That is, damage for purposes of
the damage-accrual rule occurs once a party suffers any legally
cognizable damage. . . .

Ames, 798 N.W.2d at 562 (citations omitted).

A series of cases illustrate how early "some damage" can begin.  In

Herrmann v. McMenomy & Severson, the plaintiffs sued their attorneys for

negligence for failing to advise them that certain business transactions involving

an employee trust were prohibited, which subjected the trust to "significant

federal excise taxes and interest."  590 N.W.2d 641, 642 (Minn. 1999).  The first of

the prohibited transactions occurred in 1987.  The court held that the plaintiffs'

claims accrued when the plaintiffs entered "the first prohibited transaction"

rather than in 1993 when they became aware of their illegality and "began

expending money to address the prohibited transactions" because that is when

the plaintiffs "became immediately liable" for taxes and interest.  Id. at 642-44.

The court further held that the running of the statute of limitations "does not

depend on the ability to ascertain the exact amount of damages" and that

ignorance of a cause of action does not toll the statute of limitations.  Id. at 643

(rejecting the "discovery rule" for determining when SOL begins to run).

Similarly, in <u>Antone v. Mirviss</u>, the plaintiff argued that a prenuptial agreement did not protect his interest in marital appreciation to his premarital property.  720 N.W.2d 331, 333 (Minn. 2006).  The court held that the plaintiff suffered "some damage" beginning the day he got married—the date he "passed a point of no return with respect to the laws of marital and nonmarital property"—rather than the day the marriage was legally dissolved.  <u>Id.</u> at 337-38.  Accordingly, because this date was more than six years before the plaintiff sued the attorney who drafted the prenup, the statute of limitations barred the plaintiff's claim.  <u>Id.</u> at 338.

Likewise, in an accountant malpractice case based on an "allegedly negligent failure to make or advise to make" an election on a partnership's tax returns, the cause of action accrued, and the SOL began to run, at the time the returns were filed without the election, not one year later when the automatic extension period expired.  <u>Ames</u>, 798 N.W.2d at 564.  The plaintiffs were damaged when the returns were filed without the elections because they overpaid taxes and lost the use of those funds starting on that date.  <u>Id.</u>

Moreover, even when a professional "provides a series of separate and distinct services over a period of years, the existence of an ongoing relationship

does not toll the statute of limitations with regard to acts of negligence for which service has been completed." <u>Reid Enters., Inc. v. Deloitte & Touche, LLP</u>, No. C8-99-1801, 2000 WL 665684, at *3 (Minn. Ct. App. May 23, 2000) (accountant malpractice) (citing <u>Hermann</u>, 590 N.W.2d at 643–44). Any "separate or continuing negligence" by a defendant after the running of the statute of limitations was "entirely irrelevant" because the penalty for the defendant's alleged negligence had already attached and was "irreversible." <u>Id.</u>

However, in <u>Frederick v. Wallerich,</u> the Minnesota Supreme Court held that independent acts of alleged negligence by the same attorney could give rise to independent causes of action for legal malpractice. 907 N.W.2d 167, 174 (Minn. 2018). In <u>Frederick</u>, an attorney prepared an unenforceable antenuptial agreement ("the agreement"). <u>Id.</u> at 170–71. A year later, the same attorney drafted a will for the plaintiff that incorporated the agreement and reassured him that the agreement was valid and enforceable. <u>Id.</u> at 171. Following his divorce, the plaintiff sued the attorney for malpractice and argued that the attorney's subsequent representations regarding the validity of the agreement together with incorporation of the agreement into the will constituted an independent act of legal malpractice, triggering its own limitations period. <u>Id.</u> at 172. The court

24

held that "some damage" occurred when the attorney drafted, and the plaintiff

executed, his will because the plaintiff had lost the "opportunity to mitigate

<u>additional</u> damages" as a result of a second negligent act: the attorney's failure to

inform the plaintiff of the invalidity of the antenuptial agreement when drafting

the will.  <u>Id.</u> at 179 (emphasis in original).  As a result of this second negligent

act, the attorney was exposed to additional asset appreciation owed to his spouse

upon divorce.  <u>Id.</u>  Among other things, the court reasoned that the "two acts

[were] not connected by a sufficient causal link that would necessitate a

conclusion that the two acts flowed from the same negligence."  <u>Id.</u> at 176.

### b.    EB's Arguments

EB argues that SHIP seeks to recover for alleged professional negligence

that occurred as early as 2013.  (Doc. 42 at 6 (citing Countercl. ¶¶ 177 ("the

material deficiency in SHIP's loss reserves that was or should have been

apparent <u>as of 2013-2014</u> . . . Had [EB] investigated and addressed SHIP's

reserves <u>at that time</u>, . . . SHIP would have avoided entirely its ill-advised

investment decisions, SHIP would have made prudent financial decisions to its

benefit during that time, and SHIP would have benefitted from additional

regulatory oversight") (emphasis in Doc. 42).)

c.      SHIP's Arguments

SHIP responds that its claims did not accrue until after 2016 and that EB's claims to the contrary are "categorically false based on the Amended Counterclaim itself." (Doc. 48 at 16.) SHIP asserts that EB wants the Court to ignore the motion to dismiss standard and to instead draw inferences in favor of EB. (Id. at 18-19.)

SHIP also argues that the Court should reject EB's approach to determining when a cause of action accrued because SHIP has alleged the occurrence of independent acts by EB in each year it provided services to SHIP, and "each independent act by a professional can create a new cause of action of malpractice." (Id. (citing Frederick, 907 N.W.2d at 176 (finding "minimal showing" of independent act of negligence sufficient to survive motion for judgment on the pleadings).) SHIP states that EB cannot use its initial errors "to excuse its later negligence and breaches of professional standards" and at a minimum, SHIP has alleged independent acts sufficient to permit its claims to move forward to discovery on liability and damages. (Id. & n.4.)

SHIP specifically asserts that EB's acts related to the Beechwood and Roebling transactions were independent acts of negligence and malpractice

under <u>Frederick</u>.  SHIP argues there is "no question" regarding the over $100

million damages that SHIP suffered from the Beechwood investments, although

the exact date of that damage is yet to be determined.  SHIP avers that discovery

on this issue is crucial because discovery may show that SHIP did not suffer

damage until 2016.  (<u>Id.</u> at 21.)  SHIP states, "We do know that even after the

arrest of the co-founder in June 2016, SHIP hired an outside consultant to

investigate the situation and it was not until the end of 2016 that SHIP

understood that the investment was a failure and that money was likely lost."

(<u>Id.</u> (citing Countercl. ¶¶ 75-82).)  SHIP also notes that all facts related to

Roebling occurred in 2016.

SHIP further asserts that EB's "unprofessional and deceitful acts

surrounding the replacement of L&E with Axene," only occurred once and "the

magnitude of harm it caused is yet to be determined."  (<u>Id.</u>)  This "act" occurred

in the first and second quarters of 2016 and is therefore not time barred.

### d.    Analysis

EB spends much of its brief reiterating claims from the Counterclaim in

support of the argument that SHIP is merely asserting that EB continued to make

27

the same errors year-after-year in and after 2016.  (Doc. 42 at 20-22 (citing <u>Reid</u>

<u>Enters.,</u> 2000 WL 665684, at *3); Doc. 50 at 12-14 (same).)

SHIP, on the other hand, asserts that EB failed to conduct its duties

according to GAAS and otherwise failed to identify material deficiencies in

SHIP's loss reserves in 2013-2014, which resulted in SHIP making the

catastrophic Beechwood and Roebling transactions based on Milliman's faulty

actuarial work.  SHIP suffered damages as a result.  The Parties focus on these

transactions and EB's hiring of Axene, and the Court does the same.

### i.   Beechwood

SHIP entered into the series of investments with Beechwood in 2014 and

2015.  (Countercl. ¶ 63.)  The Counterclaim asserts that Beechwood "provided

valuations that were not truly independent, but rather were concocted by an

entity that worked closely with Beechwood Re to ensure they were consistent

with Beechwood Re's expectations and needs," and SHIP suffered harm in

February 2014 when it invested $320 million in exchange for a guaranteed annual

return of 5.85%.  (<u>Id.</u> ¶¶ 63, 73.)  The Counterclaim also states that in October

2014, a Fuzion auditor discovered that the investments were not compliant with

2014 NAIC guidance.  (<u>Id.</u> ¶ 67.)  In addition, as discussed above, SHIP's

investment in Beechwood was secured by three IMAs with BAM that SHIP entered into in 2014 and 2015 by which "SHIP forfeited its rights to the collateral purportedly securing the return promised by Beechwood," which certainly states damage as of the date of these IMAs.  (Id. ¶ 69.)  The Counterclaim also states that the IMAs were not only structured so that SHIP had no oversight or ability to exercise any rights with regard to its Beechwood investments and gave Beechwood "ultimate control over the investment," but also that the IMAs violated Pennsylvania law because they did not require SHIP to report performance fees it paid to Beechwood.  (Id. ¶¶ 70-72.)

These were not, as SHIP argues, independent acts under Frederick, because these acts were connected by a causal link—the failure of EB to do its work in compliance with GAAS and other standards, including having knowledge of the LTC industry.  907 N.W.2d at 176 (non-exhaustive list of facts supporting Frederick holding).  Thus, the Beechwood investments were connected by a causal link to the first acts alleged in the Counterclaim.  Id.  The Counterclaim alleges that if not for EB's failure to comply with GAAS and other standards, especially to properly review Milliman's work, SHIP would not have

entered into the Beechwood investments in 2014 and 2015.  (Countercl. ¶ 60.)

This distinguishes the investment from the will written in <u>Frederick</u>.  Here,

> SHIP relied on the purported expertise, advice, and opinions of [EB]
> to help make critical financial decisions in the management of its
> business. . . . [and EB's] failure to adequately perform its duties in
> accordance with GAAS ultimately inured to SHIP's tremendous
> detriment, as doing so permitted SHIP to enter into and remain in . .
> . the Beechwood Re transactions in 2014 and 2015.

(<u>Id.</u> ¶¶ 47, 60.)  Beechwood's alleged guaranteed rate of return should also have

been "an <u>immediate</u> red flag" for EB.  (<u>Id.</u> ¶ 64 (emphasis added).)

In addition, although SHIP argues that discovery is necessary because it

may show that SHIP suffered damages from the Beechwood investments in 2016,

as discussed above, SHIP suffered damages prior to that, and discovery is

therefore unnecessary.

Accordingly, claims related to the Beechwood investments will be

dismissed because they are time barred.

### ii.    Roebling

SHIP alleges that as a result of EB's failures, "SHIP suffered financial

damages including but not limited to those that arose from the Roebling []

transaction as well as damages arising from the inaccurately audited 2017

financial results."  (Countercl. ¶ 118.)  SHIP further argues that "[e]very detail

relating to the Roebling transaction, and every act and omission by [EB] that

caused or contributed to SHIP's damages arising from the transaction, occurred

in 2016 and beyond.  Moreover, [EB's] transgressions with respect to Roebling Re

are wholly independent of, and have no relation to, [EB's] failures with respect to

its review of Milliman's actuarial assumptions or the Beechwood investments."

(Doc. 48 at 12.)

EB responds that despite including allegations related to EB's work in 2016

and thereafter, SHIP has plainly alleged that "had Eide Bailly uncovered the

reserve deficiency prior to 2016, SHIP would have not been in a position to enter

into the reinsurance agreement with Roebling Re, which created millions of

dollars in avoidable expenses" and that EB's issuance of "clean" audit opinions

beginning in 2013 put SHIP in the position to enter into the Roebling transaction

in the first place.  (Doc. 42 at 14-15 (citing Countercl. ¶¶ 159, 175) (emphasis in

Doc. 42).)  Thus, EB argues that this transaction is also time barred.

The Court finds that the Roebling transaction is different from the

Beechwood investments for two reasons.  First, while there was no alleged

nefarious purpose attached to the initial Beechwood investments, the alleged

motivation for the Roebling transaction was "the desire to enable SHIP to

mislead regulators as to its true financial condition and to facilitate these

investments outside regulatory scrutiny, and [EB's] failure to perform its

obligations concealed and furthered this scheme."  (Countercl. ¶ 91.)  This, if

nothing else, is worthy of discovery—at least in the context of the entire

Counterclaim.  See Glick, 944 F.3d at 717 (stating that the Court need not accept a

plaintiff's conclusory allegations as true).

Second, not only did all relevant acts related to the Roebling transaction

occur in 2016, on the face of the Counterclaim, the transaction is not causally

related to EB's prior work.  Frederick, 907 N.W.2d at 176.  At a minimum, SHIP

states the following harm unrelated to EB's failure to conduct audits of Milliman

prior to June 2016:  EB provided a November 2016 opinion that the Roebling

transaction "met the requirements for reinsurance and risk transfer standards set

forth by the NAIC and applicable Pennsylvania law. . . ."  (Countercl. ¶¶ 116-18.)

Whether claims related to the Roebling transaction will survive discovery and

subsequent motion practice is not an issue before the Court.  For now, SHIP has

stated a claim to relief that is plausible on its face.  See Zutz, 601 F.3d at 848.

Thus, this claim is not time barred.

### iii.    L&E and Axene

EB argues that SHIP's allegations related to the replacement of L&E with Axene all relate to EB's evaluation of SHIP's loss reserves.  (Doc. 50 at 13.) Specifically, EB notes that "SHIP alleges that Eide Bailly should 'have concluded that reserves were materially understated' in '2013, 2014, and 2015' and 'then from 2016 forward.'" (Id. (citing Countercl. ¶ 160).)  Thus, EB argues that SHIP only alleges that EB repeatedly made the same alleged error before and after 2016.  (Id. (citing Reid Enters., 2000 WL 665684, at *3).)

SHIP counters that EB committed "unprofessional and deceitful acts surrounding the replacement of L&E with Axene."  (Doc. 48 at 21.)  SHIP asserts that EB hired Axene because Axene would state that Milliman's "aggressive actuarial assumptions" were reasonable and thus would allow EB to give clean audit opinions that SHIP management welcomed "[r]ather than include L&E's concerns in its audit opinion . . . ."  (Id. at 10 (citing Countercl. ¶¶ 157-58).)

The Court finds that while discovery and perhaps future motion practice may prove EB correct, for now, SHIP has stated a claim to relief that is plausible on its face that EB's choice of Axene to help it either further its bad accounting practices or cover them up is an independent act under Frederick.  There is also

no question regarding the statute of limitations on this issue because Axene was

not appointed until 2016.

Therefore, claims related to the appointment of Axene are not time barred.

### 3.   Whether SHIP States a Claim of Breach of Fiduciary Duty

### a.   The Parties' Arguments

SHIP argues that EB was not acting as an independent auditor here, but

rather was in a de facto fiduciary relationship with SHIP.  SHIP points to the

following:

> [F]rom March 31, 2016 to May 20, 2016, Joe Pope of Eide Bailly was
> in contact with Tom Hampton, the SHIP Trustee who chaired SHIP's
> Audit Committee, to let Hampton know that L&E would not back
> away from their concerns about Milliman's then recent change in
> assumptions.  Eide Bailly sought to persuade L&E, its own actuarial
> consulting expert, to modify their position. . . .  Replacing L&E with
> Axene was a clear example of Eide Bailly shopping for actuarial
> analysis that was more to the liking of SHIP management.

(Doc. 48 at 29 (citing Countercl. ¶¶ 142-49).)

SHIP also asserts that the "nefarious nature of that act" is further shown by

SHIP CFO Lorentz's and EB's Joe Pope's "separate misleading [June 2016] letters

to PID about the need for an extension of time to submit the financial

statements."  (Id. at 30 (citing Countercl. ¶¶ 149-54).)  SHIP argues that EB's

explanations for the need for an extension to file financial statements were

misleading because, while CEO Lorentz told the PID that L&E had assigned a new actuary to review SHIP's actuarial assumptions, EB had hired Axene that day and L&E had not assigned or obtained a new actuary.  (Id. (citing Countercl. ¶ 153).)  Likewise, SHIP argues that Pope's June 8, 2016 letter to the PID claiming "unforeseen delays" was misleading because Pope did not tell the PID that EB was switching actuarial consultants because EB refused to work with L&E when L&E disagreed with Milliman and instead chose Axene.  (Id. at 30-31 (citing Countercl. ¶ 154).)  Thus, SHIP avers that EB "voluntarily assumed the role of business consultant who sought to shape analysis to satisfy SHIP management," caused injury to SHIP,  and therefore should be held responsible as a de facto fiduciary.  (Id. at 31.)

EB responds that "[a]ccording to SHIP, 'in light of its duties as independent auditor, [EB] could not have relied reasonably on the findings and opinions of Milliman, [L&E], or Axene to reach a conclusion that SHIP was in sound financial condition.'  What SHIP ultimately alleges, then, is that [EB's] 2016 work did not comply with the duties of an independent auditor."  (Doc. 50 at 27 (comparing Countercl. ¶ 35 with ¶ 160).)  EB argues that this is a claim that

EB violated its duties as an independent auditor not that EB breached a separate

fiduciary duty. (Id. (citation omitted).)

EB reiterates that "[w]hen an accountant acts as an independent auditor,

its duties are not fiduciary in nature absent special circumstances because it must

perform its duties objectively and impartially." (Id. at 28 (quoting FDIC v.

Schoenberger, 781 F. Supp. 1155, 1157-58 (E.D. La. 1992)).) EB concludes that

because SHIP has not "plausibly differentiated" EB's relationship with SHIP

from its role of independent auditor, SHIP fails to state a claim for breach of

fiduciary duty. (Id.)

### b.   Analysis

"Courts do not generally regard the accountant-client relationship as a

fiduciary one." Brown-Wilbert, Inc. v. Copeland Buhl & Co., P.L.L.P., No. A07-

2462, 2008 WL 5396832, at *6 (Minn. Ct. App. Dec. 30, 2008) (citations omitted).

Independent auditors, especially, do not have a fiduciary relationship with their

clients because they act "independently, objectively and impartially," rather than

"in a representative capacity for another" as a fiduciary does. Resolution Tr.

Corp. v. KPMG Peat Marwick, 844 F. Supp. 431, 436 (N.D. Ill. 1994).

> To prove that [EB] breached a fiduciary obligation, [SHIP] had to
> establish that the two were in a fiduciary relationship and that [EB]

breached a duty arising from that relationship.  The existence of a
fiduciary relationship is generally a question of fact.  Fiduciary
relationships arise when one person trusts and confides in another
who has superior knowledge and authority.

.   .   .   .

A "fiduciary" is a person who is required to act for the benefit of
another person on all matters within the scope of their relationship.
The duty imposed on fiduciaries is the highest standard of duty
implied by law.  Minnesota caselaw recognizes two categories of
fiduciary relationship: relationships of a fiduciary nature per se, and
relationships in which circumstances establish a de facto fiduciary
obligation.

Swenson v. Bender, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009) (cleaned up)

(internal citations omitted).

To show a fiduciary relationship, SHIP must show more than the standard

accountant-client relationship, such as an assertion that EB became a de facto

officer or director of SHIP.  See Brown-Wilbert, 2008 WL 5396832, at *6.  Placing

trust and confidence in a firm as an independent advisor is insufficient to create a

fiduciary duty.  See Resol. Tr., 844 F. Supp. at 436 (affirming dismissal of certain

claims against independent auditor in case based, at least in part, on taking

auditor's advice).  Likewise, "an accountant hired to audit the financial

statements of a client is not a fiduciary of the client, but rather is required to be

independent of the client."  Wright v. Sutton, No. Civ. No. 1:08-1431, 2011 WL

1232607, at *4 (S.D. W. Va. Mar. 29, 2011) (quoting Strategic Cap. Res., Inc. v.

37

Citrin Cooperman & Co., LLP, 2007 WL 30836, *1 (11th Cir. 2007)) (gathering cases); Resol. Tr., 844 F. Supp. at 436 ("the nature of an independent auditor is that it will perform the services objectively and impartially") (quoting Schoenberger, 781 F. Supp. at 1157).

Thus, the issue before the Court is whether SHIP asserts "special circumstances" that created a fiduciary relationship.  See Swenson, 764 N.W.2d at 601; Resol. Tr., 844 F. Supp. at 436 (stating that "special circumstances" are required to create a de facto fiduciary relationship).

Although the Court must look at the claims in the light most favorable to the party asserting them, the Court finds that SHIP fails to establish the existence of a fiduciary relationship.  SHIP relies on ¶¶ 149-54 of the Counterclaim, which accuses EB's Pope and SHIP's Lorentz of making misleading statements to the PID.  However, the statements seeking extensions, while not necessarily sharing all details about what was allegedly going on behind the scenes at SHIP in May and June 2016, do not show there were "special circumstances" that created a fiduciary duty for EB.

In context, conducting a search for an actuarial firm that could provide "actuarial expertise of [EB's] audit of SHIP's business" qualified as an

"unforeseen delay," even if the search began immediately on May 20, which was only 11 days before the June 1 statutory deadline to submit the 2015 audited report to the PID.  (Countercl. ¶¶ 50, 150.)  Moreover, contrary to SHIP's argument, SHIP's own CEO Lorentz told the PID on June 6 that SHIP had a new actuary, although SHIP is correct that EB, not L&E, assigned the actuary.  (Id. ¶¶ 152-53.)  This misstatement, however, does not show that EB assumed the role of business consultant who shaped analysis to satisfy SHIP management.

Accordingly, the Court finds that SHIP does not state a claim for breach of fiduciary duty.  This claim will be dismissed.

### 4. Whether Fraudulent Concealment Tolls the Statute of Limitations

Because this case arises under the Court's diversity jurisdiction, the Court applies state tolling law and federal procedural law.  Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011) (citation omitted).  Under Minnesota law, the statute of limitations may be tolled if the cause of action is fraudulently concealed by the defendant.  Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992) (citing Schmucking v. Mayo, 235 N.W. 633, 634 (1931)).

Federal Rule of Civil Procedure 9(b) requires fraud claims to be pleaded with particularity.  "In other words, the complaint must plead the who, what,

where, when, and how" of the alleged fraud.  <u>Drobnak v. Andersen Corp.</u>, 561

F.3d 778, 783 (8th Cir. 2009) (citation omitted).  "This requirement is designed to

enable defendants to respond specifically, at an early stage of the case, to

potentially damaging allegations of immoral and criminal conduct. . . .

Conclusory allegations that a defendant's conduct was fraudulent and deceptive

are not sufficient to satisfy the rule."  <u>BJC Health Sys. v. Columbia Cas. Co.</u>, 478

F.3d 908, 917 (8th Cir. 2007) (cleaned up) (citations omitted).

SHIP argues that EB fraudulently concealed "its faulty work" by issuing

faulty audit opinions that communicated financial surpluses when SHIP was

running deficits; that EB's willingness to replace L&E with Axene to "mask

actuarial flaws" was evidence of this concealment; and that EB worked with

SHIP management to mislead PID regulators as to the reason why the 2015 audit

would be delayed.  (Doc. 48 at 24-25.)  Thus, SHIP argues that the only way it

could have possibly discovered EB's fraud would have been to hire its own team

of independent outside auditors, who in turn, would have had to hire a LTC

actuarial consultant, to audit EB.  (<u>Id.</u> at 25.)

EB responds that SHIP has not pleaded fraudulent concealment in its

counterclaim at all, let alone with particularity.  (Doc. 50 at 16.)  EB points out

that SHIP alleges that SHIP, itself, participated in the alleged fraud and therefore the allegation that it would have had to hire outside auditors to discover any fraud is without merit.  (Id. at 17-19.)  EB also argues that SHIP has not articulated the "who, what, when, where, and why" of the fraud.  (Id. at 16.)

EB further asserts that SHIP does not allege any "plausible reason" why EB—"a reputable, independent auditing firm"—would have participated in SHIP's alleged effort to fraudulently conceal information from regulators or anyone else.  (Id. at 4, 17 (citing Varga v. U.S. Bank Nat'l Ass'n, 952 F. Supp. 2d 850, 860 (D. Minn. 2013) (holding that to plead aider and abettor fraud for a corporate professional, the complaint had to state some kind of incentive for breaching fiduciary duties/"taking such a huge financial risk"), aff'd, 764 F.3d 833 (8th Cir. 2014)).)

The Court finds that because there is no claim for fraudulent concealment in the Counterclaim, there is no allegation pleading the "who, what, where, when, and how" of the alleged fraud.  Drobnak, 561 F.3d at 783.  SHIP does not even cite specific paragraphs of the Counterclaim in its arguments that would alert the Court to what sections of the Counterclaim constitute a claim of fraudulent concealment.  Moreover, even if SHIP claimed the who, what, where,

when, and how of the alleged fraud, SHIP cannot claim ignorance of the alleged

fraud because SHIP states that Lorentz assisted in furthering the deceit.  See

Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 919 (Minn. 1990) ("Merely

establishing that a defendant had intentionally concealed the alleged defects is

insufficient; the claimant must establish that it was actually unaware that the

defect existed before a finding of fraudulent concealment can be sustained.").

Finally, the Court agrees with EB that SHIP fails to allege any plausible

reason why EB would have participated in an effort to fraudulently conceal

information from regulators or anyone else.  The reputational and financial risk

would just be too great.  See Varga, 952 F. Supp. 2d at 860.  Therefore, the statute

of limitations is not tolled by fraudulent concealment.  To the extent SHIP

purports to assert a claim of fraudulent concealment, that claim is dismissed.

### 5.    Whether Public Policy Tolls the Statute of Limitations

SHIP argues that the statute of limitations should be tolled because "[t]he

Rehabilitator's arguments invoke equitable analyses requiring the consideration

of competing facts, and the Court should not resolve these public policy

considerations at the pleading stage before the Rehabilitator has an opportunity

to develop the factual record."  (Doc. 48 at 26.)  SHIP notes that the general

purpose of both Pennsylvania's and Minnesota's insurance receivership schemes

42

is to protect the public, insureds, and creditors related to a major insolvency.  (Id. (citing Foster v. Mutual Fire, Marine & Inland Ins. Co., 614 A.2d 1086, 1091 (Pa. 1992); Minn. Stat. § 60B.01(4)(a)).)  SHIP states that although the Rehabilitator appears solely in his capacity as Rehabilitator, the claims in this action are not limited to SHIP's direct interests and are pursued on behalf of its creditors and policyholders as well, and thus SHIP steps into the shoes of the insurer to recoup its assets and to protect the rights of SHIP's creditors, policyholders, and shareholders.  (Id. at 27 (citation omitted).)  SHIP also argues that because EB concealed that any losses suffered by SHIP "were caused by malfeasance and deception by [EB]," policy considerations dictate that EB be precluded from avoiding liability for the losses caused by that malfeasance.  (Id. at 28.)

SHIP's attempt to convince the Court to adopt Pennsylvania public policy is unavailing.  Minnesota does not recognize the discovery rule.  Herrmann, 590 N.W.2d at 643; Untiedt's Vegetable Farm, 493 F. Supp. 3d at 768 n.6 ("Minnesota applies the occurrence rule, not the discovery rule, in determining when a claim for breach of contract accrues").  Moreover, SHIP cannot claim that it did not know about the alleged underlying concealment prior to the 2020 rehabilitation order because it admits in the Counterclaim that it did know.  The Counterclaim

43

alleges that it "became clear that the valuation" of the Beechwood investments "was likely inaccurate" in November 2016; that SHIP "exited the Roebling transaction at the urging of the PID" in April 2018; and that SHIP alleges that the PID's external consultant reviewed SHIP's reserves and identified several issues leading to recognition that "its projected assets were materially short of expected liabilities" in 2018.  (Countercl. ¶¶ 79, 109, 161) (quotations cleaned up).)  Public policy does not toll the statute of limitations.

## IV.    ORDER

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.    Plaintiff-Counter Defendant Eide Bailly's Motion to Dismiss the Amended Counterclaim **[Doc. 40]** is **GRANTED in part and DENIED in part:**

   a.  The Motion is **GRANTED** as to a finding that Minnesota law governs interpretation of the engagement agreements at issue;

   b.  The Motion is **GRANTED** as to **the Beechwood Re Investments**;

   c.  The Motion is **GRANTED** as to **the Claim of Breach of Fiduciary Duty**;

   d.  The Motion is **GRANTED** as to a finding that Fraudulent Concealment and Public Policy **do not toll the applicable statutes of limitations**;

   e.  The Motion is **DENIED** as to **the Roebling Re Transaction**;

    f.   The Motion is **DENIED** as to claims related **to the appointment of Axene;**

    g.   Claims as to the **Beechwood Re Investments** are **DISMISSED WITH PREJUDICE**;

    h.   To the extent Defendant-Counter Claimant asserts that the Counterclaim states a claim for **fraudulent concealment**, that purported claim is **DISMISSED WITH PREJUDICE**; and

    i.   The claim of **Breach of Fiduciary Duty** is **DISMISSED WITHOUT PREJUDICE**.

2.    The Parties are directed to contact Magistrate Judge Brisbois within 14 days of the date of this Order to schedule a status conference to discuss necessary scheduling orders and/or refiling deadlines to comply with this Order and move this case forward.

Dated:  March 29, 2024                s/Michael J. Davis

                                           Michael J. Davis
                                           United States District Court